CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
APR 09 2014
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| HAROLD E. LEONARD, | Civil Action No. 1:13CV00029 |
| Plaintiff, | |
| | **MEMORANDUM OPINION** |
| v. | |
| | Hon. Glen E. Conrad |
| ELECTRO-MECHANICAL CORPORATION, | Chief United States District Judge |
| Defendant. | |

In this employment discrimination action, the plaintiff claims that the defendant violated his rights under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12117, and the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654. The case is presently before the court on the defendant's motion for summary judgment. For the reasons set forth below, the motion will be granted.

## Factual Background

The following facts are presented in the light most favorable to the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

From April 8, 2002 until July 12, 2012, Harold E. Leonard was employed as a janitor for Electro-Mechanical Corporation (Electro), a manufacturing company headquartered in Bristol, Virginia. Leonard's primary duties included emptying trash cans, picking up trash in the company parking lot, cleaning up broken glass, sweeping the sidewalks, vacuuming the entryway, and stripping and waxing the floors.

Leonard suffers from degenerative disc disease. During his period of employment with Electro, this condition periodically resulted in pain "flare-ups," which varied in severity. Leonard

Dep. at 90, 132-33. When Leonard experienced "little flare-up[s]," which caused his hip and leg to "hurt real[ly] bad," he would sit down for up to five minutes to reduce the pressure. Id. at 132-33. When he experienced flare-ups that resulted in more severe pain, he would take FMLA leave and undergo epidural steroid injections. Id. at 90, 132.

On or about March 29, 2012, Leonard told his supervisor, Brian Harris, that his wife was having a surgical procedure performed on April 2, 2012, and that he needed to take leave to go with her. Leonard subsequently learned that his wife's surgery would not be performed until April 3, 2012. Consequently, he went to work on April 2, 2012, rather than taking leave that day. After working a few hours, Leonard "got [a] catch in [his] back and pain started going down [his] leg." Id. at 220. Upon seeing Leonard in pain, Harris advised him to "go on home." Id.

Leonard remained off work from April 3, 2012 until April 6, 2012. During that time, Leonard did not call in to advise Electro that he would be absent. Upon returning to work on April 9, 2012, Leonard presented the company with two return-to-work certificates from his treating physician, Dr. Shannon Finch, who had given him an epidural steroid injection for pain. Id. at 109. The certificates requested that Leonard be excused from work the previous week.

On April 10, 2012, Sherie Huggins, Electro's Human Resources Manager, and Mike Stollings, another Human Resources representative, met with Leonard regarding his absences and his failure to call in as required by the company's attendance policy. Stollings explained the attendance policy to Leonard, and told him that he had no choice but to issue a one-day suspension. Leonard "accept[ed]" the action, recognizing that "it was [his] fault" for not calling in to report his absences. Id. at 117.

During the April 10, 2012 meeting, Leonard received a written job description for Dr. Finch to review and sign. Dr. Finch faxed the signed form to Electro on April 12, 2012. By

2

signing the form, Dr. Finch confirmed that he had read the description of Leonard's janitorial responsibilities and was of the opinion that Leonard was "fit for duty with no restrictions." Leonard Dep. Ex. 9 at 2. Upon obtaining the form, Electro allowed Leonard to return to work. Leonard proceeded to work without interruption until June 7, 2012.

Less than six weeks after Dr. Finch faxed the signed job description to Electro, he sent the company a Certification of Health Care Provider for Employee's Serious Health Condition (FMLA) form, which he completed on May 21, 2012 after examining Leonard. Dr. Finch reported that he had treated Leonard for degenerative disc disease on several occasions including that date, and that Leonard "cannot perform any job [functions] when [the] condition flares." Leonard Dep. Ex. 10 at 2. Dr. Finch noted that the condition causes flare-ups that would periodically prevent Leonard from performing his job, and that it would be necessary for Leonard to be absent from work during the flare-ups. Id. at 3. When asked to estimate the frequency of the flare-ups that Leonard may have over the next six months, Dr. Finch indicated that he may have one to two episodes per month that last three to five days per episode. Id.

On the morning of June 6, 2012, Leonard approached Todd Dewar, Electro's General Manager, at the suggestion of another employee, and advised Dewar of his back impairment and the fact that he occasionally needed to sit and rest. During his deposition, Leonard provided the following summary of the conversation:

> . . . Todd was coming through and I was dumping trash. And I . . . asked Todd about his back.
>
> I said, "I heard you had back trouble."
>
> He said, "I had a cyst taken off of my back when I was younger." I told him that I had back trouble too, degenerative disc disease.

3

> And I sa[id], "Occasionally I have a flare-up. Whenever I do, I have to sit down for just a minute or two, maybe five minutes, and I get up and I'm fine. Go back to work."
>
> And that was all that was said.

Leonard Dep. at 135.

On the afternoon of June 6, 2012, Dewar sent an email to Huggins and Stollings regarding his conversation with Leonard. The email stated as follows:

> This morning Harold pulled me aside and asked about my previous back issues – referring to my spine surgery some 20 years ago. Harold relayed that he was having back issues of his own – more specifically that he had "degenerating" disks and bones in his lower back. He stated that this was causing him pain when he lifted the trash cans to empty them. He then said that this pain would cause him to sit and rest for 5 to 10 minutes after which he would feel better and could continue his work. Finally he noted this was a constant issue he was dealing with and I may see him frequently "resting."
>
> At this point, I have concerns with him being on the floor and his ability to do the job in the shop – for his safety and well being as well as that of others.
> Please let me know if you have any questions regarding this discussion.

Leonard Dep. Ex. 11.

Following his conversation with Dewar, Leonard found three metal ball bearings in the bottom of one of the trash cans that he was responsible for dumping. Leonard Dep. at 160-61. He showed the bearings to another employee, Alfred Duty, who estimated that they weighed approximately ten to twenty pounds. Duty Decl. at ¶ 9.

On June 7, 2012, Huggins and Harris met with Leonard regarding the medical issues he reported to Dewar. Leonard Dep. at 144-45. They advised Leonard that Electro had scheduled an independent medical examination (IME) with an orthopedist on June 29, 2012, and that he could not return to work until after the examination had been conducted.

In a letter dated June 8, 2012, Huggins advised Leonard that Electro would be handling his absence under the company's FMLA policy, that his FMLA leave would commence on June 13,

4

2012, and that he had four weeks of FMLA leave remaining. Leonard Dep. Ex. 9. During his deposition, Leonard testified that he did not recall receiving this letter. Leonard Dep. at 147.

On June 11, 2012, Leonard met with Huggins and requested further explanation as to why he had been taken out of work. They discussed their previous meeting with Harris, but Huggins declined "to write down what [they] talked about." Id. at 149. She provided Leonard with FMLA and/or short term disability paperwork for Dr. Finch to complete. Leonard subsequently reported that Dr. Finch would not complete the paperwork because Leonard had been "released to go back to work." Id. at 149-50.

Prior to the IME appointment on June 29, 2012, Huggins called Leonard and left him messages reminding him about the appointment. Leonard did not respond to the messages, appear for the appointment, or return to work. His FMLA leave expired on July 10, 2012. Huggins Dep. at 38.

On July 12, 2012, Huggins issued a letter terminating Leonard's employment with Electro. The letter included the following explanation:

> This letter is to advise you that your employment with Electro-Mechanical Corporation is terminated effective July 12, 2012. This is the result of your failure to keep in contact with Electro-Mechanical Corporation, keep us updated on your medical condition, keep your scheduled appointment for the independent medical examination, and to return the messages I have left for you. Your FMLA has now expired.

Leonard Dep. Ex. 13. Prior to the issuance of the letter, Leonard retained counsel and applied for unemployment benefits.

## Procedural History

On or about August 3, 2012, Leonard filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that Electro discriminated against him in

5

violation of the ADA. Thereafter, the EEOC issued a right-to-sue letter. Although the letter indicates that it was mailed to Leonard's attorney on December 10, 2012, the envelope containing the letter was not postmarked until December 27, 2012.

On March 28, 2013, Leonard filed the instant action claiming that Electro violated his rights under the ADA and the FMLA. Following the completion of discovery, Electro moved for summary judgment. The court held a hearing on the motion on March 7, 2014. The motion has been fully briefed and is ripe for review.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-movant. Anderson, 477 U.S. at 255. To withstand a summary judgment motion, the non-movant must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. Id. at 248. "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the non-movant's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)); see also Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) ("[M]ere suspicions are insufficient to overcome a motion for summary judgment.").

## Discussion

### I. Plaintiff's claims under the ADA

Leonard alleges that Electro violated the ADA by demanding that he submit to an independent medical examination. Leonard also alleges that he was terminated because of his

disability, in violation of the ADA. For the following reasons, the court concludes that both claims are without merit.[1]

A. **Independent medical examination claim**

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This prohibition against discrimination includes certain "medical examinations and inquiries." 42 U.S.C. § 12112(d)(1). Once an employee has been hired, an employer cannot require the employee to undergo a medical examination "unless such examination . . . is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). "The interpretative guidelines to the ADA explain that [this provision] was intended to prevent against 'medical tests and inquiries that do not serve a legitimate business purpose.'" EEOC v. Prevo's Family Market, Inc., 135 F.3d 1089, 1094 (6th Cir. 1998) (quoting 29 C.F.R. pt. 1630, App'x 1630.13(b)).

Relying on the interpretative guidelines issued by the EEOC, courts have identified several permissible grounds for requesting a medical examination. As relevant in the instant case, courts have held that an employer's request for a medical examination is job-related and consistent with business necessity when an employer has a reasonable basis to believe that an employee's medical

---

[1] In light of the court's rulings on the merits of the plaintiff's ADA claims, the court need not address the defendant's argument that they were not timely filed.

condition will impair his ability to perform the essential functions of his job.[2] See Porter v. U.S. Alumoweld Co., 125 F.3d 243, 246 (4th Cir. 1997) (Section 12112(d)(4) "'permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or job.'") (quoting 29 C.F.R. Part 1630, App. § 1630.14(c)); see also Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 90 (2d Cir. 2003) ("The case law on inquiries directed toward individual employees . . . demonstrates that courts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties . . . ."); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 812 (6th Cir. 1999) ("As the district court held, health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination even if the examination might disclose whether the employee is disabled or the extent of any disability.") (internal citations and quotation marks omitted).

The determination of whether a required medical examination is job-related and consistent with business necessity is an "objective inquiry." Pence v. Tenneco Automotive Operating Co., Inc., 169 F. App'x 808, 812 (4th Cir. 2006) (citing Tice v. Ctr. Area Transp. Auth., 247 F.3d 506,

---

[2] Courts have also held that an employer's request for a medical examination is job-related and consistent with business necessity when an employee poses a direct threat to himself or others, or the employee requests an accommodation. Denman v. Davey Tree Expert Co., 266 F. App'x 377, 379 (6th Cir. 2007) (citing cases); see also Pence v. Tenneco Automotive Operating Co., Inc., 169 F. App'x 808, 812 (4th Cir. 2006) (emphasizing that "[i]t is undoubtedly 'job-related and consistent with business necessity' to ascertain whether . . . an employee poses a danger to the workplace"); Davenport v. Michelin N. Am., Inc., No. 6:12-cv-02064, 2012 U.S. Dist. LEXIS 155690, at *9 (D. S.C. Oct. 25, 2012) (noting that "[e]mployers may also 'require medical examinations necessary to the reasonable accommodation process'") (quoting 29 C.F.R. Pt. 1630, App. § 1630.14(c)).

518 (3d Cir. 2001)). Accordingly, the court "need not resolve any dispute about what [an employer's] subjective motivations were" for requiring an examination. Id. Instead, the court need only decide whether the requirement was "supported by evidence that would 'cause a reasonable person to inquire as to whether an employee is still capable of performing his job.'" Nelson v. Thomasville Furniture Indust., Inc., No. 1:00CV01007, 2002 U.S. Dist. LEXIS 5683, at *7 (M.D.N.C. Jan. 17, 2002) (quoting Sullivan, 197 F.3d at 811).

Upon review of the record, the court concludes that the independent medical examination at issue satisfied this standard. At the time Leonard was ordered to undergo the examination, Electro had received seemingly conflicting opinions from Leonard's treating physician, Dr. Shannon Finch. In April 2012, Dr. Finch reviewed the written job description for Leonard's janitorial position and advised Electro that Leonard was "fit for duty with no restrictions." Leonard Dep. Ex. 9 at 2. The following month, however, Electro received another form from Dr. Finch, which indicated that Leonard's back problems would affect his ability to perform his essential job functions. When asked whether "the employee [is] unable to perform any of his . . . job functions due to the condition," Dr. Finch responded in the affirmative. Leonard Dep. Ex. 10 at 2. When asked to identify the job functions that Leonard would be unable to perform, Dr. Finch stated that Leonard "cannot perform any job functions when [his] condition flares." Id. Dr. Finch estimated that Leonard may experience flare-ups once or twice a month that would prevent him from performing his job functions, and that the flare-ups may last three to five days. Id.

A few weeks later, Leonard approached Todd Dewar, the General Manager, and advised Dewar that he had been diagnosed with degenerative disc disease, and that he had to occasionally sit down for several minutes in order to relieve the pain. Dewar subsequently contacted Sherie

Huggins and Mike Stollings, and expressed concern regarding Leonard's ability to safely perform his job duties. While Leonard argues that Dewar's email summarizing their conversation exaggerated the frequency and duration of his pain flare-ups, it is undisputed that Leonard's back condition periodically affected his ability to work, and that he voluntarily shared this information with Dewar. See, e.g., Leonard Dep. at 111 ("I said, 'Occasionally, it may flare up and when it does I might have to sit down for a few minutes and get the pressure off of it. Then I can get back up and go back to work.'"); Id. at 133 ("It's mostly hip and leg [pain] . . . . You know, may pinch a nerve a little bit and make it hurt real bad . . . . And so, I'd sit down in Brian's office there for just a few minutes. Then I'd get back up and go to work.").

Under these circumstances, the court concludes that Electro had reasonable cause to question whether Leonard could still perform the essential functions of his job. The mere fact that Leonard believed that he was still capable of performing the essential functions of his job, or that he continued to perform his job in spite of the pain that he experienced, is simply "not relevant to whether [the defendant] could request a medical examination under the ADA." Nelson, 2002 U.S. Dist. LEXIS 5683, at *8 (citing Johnson v. Goodwill Indus. of Eastern North Carolina, No. 5:97CV740, 1998 U.S. Dist. LEXIS 21040, at *12 (E.D.N.C. Dec. 17, 1998)). As the district court explained in Johnson:

> An employer cannot be expected to understand the symptoms or ramifications of the medical conditions of its employees and must be allowed to have such conditions examined by a medical professional. Additionally, an employer cannot be expected to foresee the needs of employees or know of employee complaints related to job duties and environments without input from employees and diagnostic assistance from medical professionals. The provision of the ADA allowing medical examinations for the evaluation of an individual's ability to perform job-related functions . . . provides protection to both employers and employees.
>
> In [Porter v. U.S. Alumoweld Co., Inc., 125 F.3d 243, 246 (4th Cir. 1997], the court determined that the statement of an employee's physician that the employee is able

10

to perform essential job functions does not bar the employer from requiring its own job-related, "fitness for duty" exam pursuant to the ADA. Thus, plaintiff's own opinion that she is able to perform the duties of her job, despite admitted . . . pain, cannot bar defendant's right to request a "fitness for duty" exam under the ADA.

Johnson, 1998 U.S. Dist. LEXIS 21040, at *12-13 (additional internal citations omitted).

In response to the pending motion, Leonard emphasizes that his performance evaluations were consistently positive during his term of employment with Electro, and that he never had any on-the-job accidents. Neither of these arguments, however, is sufficient to withstand summary judgment on this issue. Courts have rejected the notion that the business necessity standard cannot be met without showing that an employee's job performance has suffered as a result of the employee's health problems. See Brownfield v. City of Yakima, 612 F.3d 1140, 1147 (9th Cir. 2010) (holding that "the business necessity standard may be met even before an employee's work performance declines if the employer is faced with significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job"). Likewise, courts have recognized that employers need not wait for an accident to occur before requiring an employee to undergo a medical examination. See Kirkish v. Mesa Imports, Inc., No. CV-08-1965, 2010 U.S. Dist. LEXIS 8060, at *16 (D. Ariz. Feb. 1, 2010) ("Common sense suggests that an employer should not have to wait for an accident to occur to justify taking preventative steps."), aff'd, 442 F. App'x 260 (9th Cir. 2011).

Based on the evidence in the record, the court concludes that Electro had legitimate grounds to question whether Leonard was still capable of performing the essential functions of his position and, thus, that the requested independent medical examination was "job-related and

11

consistent with business necessity," as required by the ADA.[3] 42 U.S.C. § 12112(d)(4)(A). Accordingly, Electro did not violate the ADA by requiring Leonard to undergo the examination.[4] For these reasons, the court will grant Electro's motion for summary judgment with respect to this claim.

### B. Discriminatory discharge claim

Leonard also claims that Electro terminated him because of his disability, in violation of the ADA. In evaluating claims under the ADA that do not involve direct evidence of discrimination, courts apply the burden-shifting scheme established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57-58 (4th Cir. 1995) (extending the McDonnell Douglas burden-shifting scheme to ADA cases). Under this approach, the plaintiff must first establish a prima facie case of discrimination. Id. at 58. If the plaintiff can successfully satisfy the elements of his prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. Id. If the employer produces sufficient evidence

---

[3] Having reached this decision, the court need not decide whether there was any other valid ground for requesting an independent medical examination. Nonetheless, to the extent Leonard's comments to Dewar could be construed as a request for accommodation under the ADA, § 12112(d)(4)(A) also "'permits employers . . . to make inquiries or require medical examinations necessary to the reasonable accommodation process . . . .'" Kennedy v. Superior Printing Co., 215 F.3d 650, 656 (6th Cir. 2000); see also Denman v. Davey Tree Expert Co., 266 F. App'x 377, 379 ("An employer's request for a medical examination is job-related and consistent with business necessity when . . . the employee requests an accommodation . . . .").

[4] Leonard also contends that Electro violated the FMLA by requiring him to undergo the independent medical examination. However, having concluded that the examination was job-related and consistent with business necessity as required by the ADA, it follows that Electro did not violate the FMLA by requesting the examination. See Porter, 125 F.3d at 247 (holding that a requested fitness for duty examination, which comported with the requirements of the ADA, did not violate the FMLA); 29 C.F.R. § 825.312(h) ("If an employer's serious health condition may also be a disability within the meaning of the ADA, the FMLA does not prevent the employer from following the procedures for requesting medical information under the ADA.").

on this point, the burden returns to the plaintiff to show why the employer's asserted justification is pretext for discrimination. Id.

In this case, even assuming that Leonard could establish a prima facie case of discrimination, Electro has articulated legitimate, nondiscriminatory reasons for terminating his employment. Specifically, Electro maintains that Leonard's termination resulted from his failure to maintain contact with the company, his failure to attend the appointment for the independent medical examination, and his failure to return to work following the expiration of his FMLA leave. Because Electro has clearly met its burden of proffering nondiscriminatory reasons for its termination decision, Leonard must show that the asserted reasons are pretext for discrimination. While Leonard advances several arguments in an attempt to establish pretext, the court concludes that he has failed to create a genuine issue of material fact with respect to this issue.

Leonard first argues that Electro's claim that he did not maintain communication with the company is "preposterous," given that he never received the June 8, 2012 letter from Sherie Huggins, which requested that he keep the company updated on the status of his medical condition.[5] Pl.'s Br. in Opp. to Summ. J. at 17. Leonard further argues that even if he had received the letter, "there was nothing about which to advise [Electro], other than [he] continued to be able to work." Id. at 18. Both arguments, however, misconstrue Leonard's burden. When an employer articulates a legitimate, nondiscriminatory basis for terminating a plaintiff, this court does not "decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (internal citation and quotation marks omitted). In assessing whether an employer's

---

[5] As summarized above, the letter also advised Leonard that Electro was handling his absence under the company's FMLA policy, that he had four weeks of FMLA leave remaining, and that his FMLA leave would commence on June 13, 2012.

proffered reason is pretextual, it is "the perception of the decisionmaker which is relevant," not the knowledge or self-assessment of the plaintiff. See Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007) (holding that the plaintiff failed to show pretext where "the uncontested evidence established that . . . the decisionmaker . . . honestly believed that [the plaintiff] deserved to be discharged for threatening [another employee], regardless of whether [the plaintiff] did in fact issue the threats"); Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 444 (4th Cir. 1998) (affirming the grant of summary judgment where the plaintiff presented "no evidence that the events recounted in the [decisionmaker's] affidavit [were] untrue or that retaliation was the true reason for [plaintiff's] firing," and explaining that the "uncontested evidence establishe[d] that [the decisionmaker] honestly believed that [plaintiff] deserved to be discharged").

In the instant case, Leonard has failed to proffer evidence from which a reasonable jury could find that the Electro officials responsible for terminating his employment did not honestly believe that Leonard deserved to be terminated for failing to maintain communication with the company. In addition to her June 8, 2012 letter to Leonard, Huggins called Leonard on multiple occasions to remind him of his appointment for the independent medical examination. It is undisputed that Leonard did not respond to the messages, appear for the scheduled appointment, or return to work. Instead, Leonard elected to cease further communications with Electro and pursue unemployment benefits. On this record, even if Leonard did not receive the June 8, 2012 letter from Huggins, which the court assumes is true for purposes of this motion, no reasonable juror could find that the proffered grounds for Leonard's termination are "unworthy of credence." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

The court must also reject Leonard's argument that his failure to undergo the independent medical examination was not a proper ground for termination. See Pl.'s Br. in Opp'n to Summ. J.

at 18 ("The only argument available to the defendant, which is without merit, is that plaintiff did not keep the medical appointment scheduled for him by defendant. However, defendant's scheduling of this exam and requiring plaintiff to undergo said exam . . . violates the ADA. . . ."). For the reasons set forth above, the court concludes that the requested independent medical examination was permissible under 42 U.S.C. § 12112(d)(4)(A). Accordingly, Electro's decision to terminate him for refusing to undergo the examination did not violate the ADA. See Porter, 125 F.3d at 246 ("We find . . . that the ADA allowed Alumoweld to request a medical examination from Porter and, therefore, the company's decision to terminate him [for refusing to undergo the examination] did not violate the ADA."); see also Brownfield, 612 F.3d at 1147 n. 2 (holding that the plaintiff's ADA retaliation claim also failed, since his referral for a medical examination was not unlawful under § 12112(d)(4)(A)); Sullivan, 197 F.3d at 813 (holding that an employee's refusal to undergo a valid examination "is not a discriminatory reason" for an adverse employment action); Johnson, 1998 U.S. Dist. LEXIS 21040, at *13 (noting that "several courts have held that an employee's refusal to submit to a job-related medical exam is proper grounds for termination").

Finally, the court finds unpersuasive Leonard's reliance on the fact that he found three metal ball bearings in the bottom of a trash can after his conversation with Dewar. While Leonard claims that this discovery caused him to suspect that Electro was "possibly setting him up for termination," Pl.'s Br. in Opp'n to Summ. J. at 10, he acknowledged at his deposition that he has no evidence that Dewar had anything to do with the disposal of the ball bearings, or that the ball bearings were intentionally placed in the wrong container. Leonard Dep. at 163 ("If Todd [Dewar] [did] it on purpose or someone else [did] it on purpose, I don't know."). Such unsupported speculation is clearly insufficient to establish that the asserted bases for his termination were pretext for disability discrimination. See Williams v. Cerberonics, Inc., 871

15

F.2d 452, 456 (4th Cir. 1985) ("[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.").

For all of these reasons, the court concludes that Leonard has failed to proffer sufficient evidence of pretext to avoid summary judgment. Accordingly, Electro's motion for summary judgment will be granted with respect to Leonard's claim of discriminatory discharge under the ADA.

## II. Plaintiff's claims under the FMLA

Under the FMLA, an eligible employee is entitled to take up to twelve weeks of unpaid leave during a twelve-month period for certain enumerated circumstances, including when the employee suffers from "a serious health condition that makes the employee unable to perform the functions" of his position. 29 U.S.C. §2612(a)(1)(D). An employee who takes such leave is entitled, upon his return to work, to be restored to a position that is the same as, or substantially equivalent to, the position he occupied when the leave began. 29 U.S.C. § 2614(a). The FMLA makes it unlawful for an employer to (a) "interfere with, restrain, or deny the exercise of" rights afforded to employees by the statute, or (b) "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a). An employee can bring an interference claim under the first prohibition or a retaliation claim under the second one. See Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 546 (4th Cir. 2006).

### A. Interference claim

Leonard first claims that Electro interfered with benefits to which he was entitled under the FMLA by placing him involuntarily on FMLA leave pending the performance of the independent medical examination. Leonard asserts that he "was ready, willing and able to work," and that this

action "required him to use his accrued leave unnecessarily." Compl. at ¶ 18. The United States Court of Appeals for the Fourth Circuit has not addressed whether placing an employee involuntarily on FMLA leave is a form of interference made actionable by the statute. Even assuming that this is a viable cause of action, the court concludes that Leonard's claim is subject to dismissal.

The Sixth Circuit appears to be the only circuit that has specifically recognized that "an employer who forces an employee to take leave may create a claim under the FMLA." Wysong v. Dow Chem. Co., 503 F.3d 441, 449 (6th Cir. 2007) (describing "[a]n involuntary-leave claim is really a type of interference claim"); but see Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 175 (2d Cir. 2006) (holding that "forced leave, by itself, does not violate any right provided by the FMLA"); Foster v. New Jersey Dep't of Transp., 255 F. App'x 670, 671 n.1 (3d Cir. 2007) (same); Willis v. Coca Cola Enters., Inc., 445 F.3d 413, 417 (5th Cir. 2006) (noting that "it is not contrary to the FMLA for an employee to be placed on involuntary FMLA leave"). In reaching this decision, however, the Sixth Circuit emphasized that such claim "ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past." Wysong, 503 F.3d at 449.

In this case, there is no evidence that Leonard requested additional FMLA leave after Electro allegedly forced him to take leave prematurely. Instead, it is undisputed that Leonard had no further communication with the company after his FMLA leave expired. Accordingly, because Leonard "cannot show that [he] was denied FMLA leave to which [he] was entitled as a result of [the defendant] forcing [him] to take earlier leave," Leonard "does not have a viable FMLA claim under the involuntary-leave theory . . . ." Id. at 450; see also Walker v. Trinity Marine Prods., Inc., 721 F.3d 542, 544-45 (8th Cir. 2013) (holding that "if forced leave can

amount to interference with a right provided under the FMLA, it can do so only if the employer's actions prevent the employee from using benefits to which she is entitled under the Act"); Grace v. Adtran, Inc., 470 F. App'x 812, 816 (11th Cir. 2012) (declining to address whether an involuntary leave claim is actionable under the FMLA, because, even under such theory, the plaintiff's claim would not be ripe since she "failed to request additional FMLA leave after [her employer] allegedly forced her to take her FMLA leave prematurely").

**B.     Retaliation claim**

Leonard also claims, in a conclusory manner, that he was terminated in violation of the FMLA. See Compl. ¶ 20 ("Defendant's termination of plaintiff's employment violated . . . plaintiff's rights under the . . . FMLA . . . ."); Pl.'s Br. in Opp'n to Summ. J. at 20 ("As stated in plaintiff's Complaint, he was terminated . . . in violation of . . . the FMLA . . . ."). FMLA claims arising under a retaliation theory are analyzed under the burden-shifting framework of McDonnell Douglas, supra. See Yashenko, 446 F.3d at 551. Thus, if an employee "puts forth sufficient evidence to establish a prima facie case of retaliation" and the employer "offers a non-discriminatory explanation" for its employment decision, the employee "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." Id. (quoting Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001)).

As discussed above, Electro has proffered nondiscriminatory reasons for terminating Leonard's employment, namely his failure to maintain communication with the company, his failure to appear for the requested independent medical examination, and his failure to return to work following the expiration of his FMLA leave. In the absence of any evidence that would create a genuine issue of material fact regarding the legitimacy of Electro's termination decision,

the court concludes that Electro is also entitled to summary judgment on Leonard's FMLA retaliation claim.

## Conclusion

For the reasons stated, the court will grant the defendant's motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 9th day of April, 2014.

_____
Chief United States District Judge